WO

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | No. CR-12-01298-001-PHX-GMS |
| Plaintiff, | **ORDER** |
| v. | |
| Gordon Sloan Smith, | |
| Defendant. | |

Pending before the Court are Defendant's three Motions to Suppress; Because of Illegal Search and Seizure Without Warrant and to Smith's Great Harm, (Doc. 43), for Failure to Afford Smith his Miranda Rights, (Doc. 45), and Because of FBI Use of Smith's Religion to Intimidate Him, (Doc. 42). For the reasons discussed below, Defendant's Motions are denied.

## BACKGROUND

On July 10, 2012, a grand jury indicted Gordon Sloan Smith on five counts related to fraud and bankruptcy. (Doc. 1.) These charges arose out of Smith's allegedly fraudulent sale of a partnership in a gold mine that he could not legally sell because it was part of a bankruptcy estate. (*Id.* at 1–6.) On July 20, FBI agents arrested Smith. (Doc. 7.)

On August 16, 2013, Smith filed three motions to suppress related to his arrest and interrogation. (Docs. 42, 43, 45.) The Court held an evidentiary hearing on October 1, 2013. The general sequence of events is not in dispute. Seven FBI agents and a local

police officer arrested Smith at his home in Carson City, Nevada, at approximately 8:30 a.m. Two agents then drove Smith to Reno, and one of them interviewed him during the trip. The agents continued to interview him at the FBI office in Reno until it was time to turn him over to the United States Marshalls, sometime before 11:00. At 11:45 a.m., Smith signed an Assertion of His Fifth and Sixth Amendment Rights. (Ex. 4.)

Although Smith was arrested on his doorstep, it appears that an FBI agent and a local police officer entered the home for several reasons. Initially, they may have looked around to be sure that no one else was present in the home. Later, they retrieved a pair of shoes and possibly socks for Smith to wear. They also retrieved Smith's cell phone to contact his daughter. Finally, they made sure the doors and windows were secure before locking the home when they left.

At 8:44 a.m., FBI Agent Tyler Woods read Smith his *Miranda* rights from a form. (Mot. Hr'g, Ex. 1.)  Smith signed the form indicating that he understood and was waiving his rights, and at 8:50 a.m. Agent Woods signed the form as a witness. (*Id.*) Smith disputes whether he signed the form at the doorstep or after he was placed in the vehicle, but the interview did not begin until after he signed the form and was in the vehicle. Agent Woods began the interview in the car because there was limited time to interview Smith before he needed to be turned over to the Marshalls. The interview in the car focused on the business transactions related to the mine and the history of the mine and Smith's bankruptcy proceedings.

FBI Agent Erron Terry drove the car and joined Agent Woods in interviewing Smith after they arrived in Reno. In Reno, the agents began to confront Smith with bank and financial records indicating the fraud. In connection with this, they informed Smith that Agent Woods had a degree in accounting from Brigham Young University. Smith is a member of The Church of Jesus Christ of Latter-day Saints. Because Brigham Young University is owned by the Church, the mention of the school may have indicated to Smith that Agent Woods was also a member of the Church, which he was.

The night before the interview, Agent Woods looked up the name of Smith's

church leader in preparation for the interview. As Agent Woods continued to review the financial records with Smith during the interview, he noted that Smith had paid tithing to his church using the fraudulently obtained money. Agent Woods challenged Smith on the integrity of this action and questioned how his actions would reflect on Smith to his fellow church members. Agent Woods mentioned Smith's church leader by name and asked whether Smith had recently told his church leaders that he was honest in his dealings.

The exact length of each portion of the interrogation is not clearly established, but Smith and the agents agree that the references to religion were the last things discussed during the interview at the FBI office in Reno. Agent Woods characterized his actions as a final appeal to Smith's highest moral ideals in an attempt to induce greater honesty and a confession. No confession was made, and both the agents and Smith agree that Smith said nothing of substance after the references to his religion.

Defendant now brings three motions to suppress based on allegations that the search was illegal, the *Miranda* warnings were ineffective, and the references to religion were intimidating.

## ANALYSIS

### 1.    Search of Smith's Home

The warrant requirement of the Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. There are exceptions to the warrant requirement. Police are permitted to perform a quick and limited search, or "protective sweep," incident to arrest, but only if the officers have a reasonable belief supported by "specific and articulable facts" that a home "harbored an individual posing a danger to the officers or others." *Maryland v. Buie*, 494 U.S. 325, 327 (1990). A warrantless search is also lawful if valid consent is given and the search remains within the scope of that consent. *Florida v. Jimeno*, 500 U.S. 248, 250–51 (1991) ("[W]e have long approved consensual searches because it is no doubt reasonable for the police to conduct a search

1    once they have been permitted to do so.").

2          Here, there were no facts presented that would justify a protective sweep, but it is

3    not clear that one occurred. Smith testified that the agents did not believe him when he

4    said that there was no one else in the home. He said that two of them may have gone into

5    the home to check, but he could not say for sure where they went other than the

6    entryway. It is clear that Smith was in the doorway at the time of the arrest, and one agent

7    testified that they may have stepped into the entryway as Smith was arrested.

8          The other searches, or entries into the home, were based on valid consent and

9    remained within the scope of that consent. Smith was barefoot and consented to have the

10   agents step inside the door to retrieve a pair of shoes and go upstairs to the bedroom to

11   get some socks. Several defense witnesses insisted that Smith did not have any socks, but

12   no other explanation was offered for why the agents went to his bedroom and nothing

13   else was taken. Smith also permitted the agents to retrieve a cell phone to contact his

14   daughter. He and his daughter agreed to have the agents lock the home and as part of that,

15   the agents made sure the doors and windows were closed.

16         Further, there is nothing to suppress because any search that may have occurred

17   did not result in the seizure of anything. The agents insist that they only went in the home

18   with consent to retrieve the shoes, socks, phone, and lock the doors. Although Smith

19   generally alleges that a search occurred, his testimony provided no specifics and he

20   admitted that his memory of the events immediately after the arrest was a blur. He says

21   that something could have been taken or seen by the agents, but does not specify anything

22   that was taken and should be suppressed.

23         Smith's Reply insists that even if no physical files were removed, the agents took

24   information by looking through Smith's files. He argues that the FBI 302 interview report

25   contains information that was discovered in the home. The testimony at the hearing

26   refutes this allegation. The agents were only at the home for approximately 15 minutes

27   and the testimony indicated that only one agent accompanied by the police officer entered

28   the home for brief periods. Smith and the agents testified that their interview did cover

the material listed in the 302 interview report, even if Smith contests the exact words or chronological order. Finally, the primary 302 report was prepared the day of the arrest and was not delayed in order to use information obtained from the search as alleged in the reply. (Mot. Hr'g, Ex. 3.) Another 302 was prepared a week later, but it did not contain the information that Smith alleges was taken from his home. (Mot. Hr'g, Ex. 2.)

If a protective sweep occurred, it was not justified, but the other searches, or entries into the home, were based on valid consent. The government flatly states that nothing was taken or will be introduced into evidence that was taken from Smith's home and Smith offered no evidence that any seizure occurred. The Motion to Suppress Evidence Because of Illegal Search and Seizure is denied because no illegal search was established and there is nothing to suppress.

**2.      Validity of *Miranda* Waiver**

No one "shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. In order to protect this right, "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Miranda v. Arizona*, 384 U.S. 436, 444 (1965). These procedural safeguards ordinarily take the form of warnings given by law enforcement officers prior to a custodial interrogation.

"To admit an inculpatory statement made by a defendant during custodial interrogation, the defendant's 'waiver of *Miranda* rights must be voluntary, knowing, and intelligent.'" *United States v. Shi*, 525 F.3d 709, 727 (9th Cir. 2008) (quoting *United States v. Garibay*, 143 F.3d 534, 536 (9th Cir. 1998)). Validity of a waiver "depends upon the totality of the circumstances including the background, experience, and conduct of defendant." *Id.* (internal quotation marks omitted). There is a presumption against waiver, and the burden is on the government to demonstrate a waiver by the preponderance of the evidence. *Id.* at 727–28; *Berghuis v. Thompkins*, 560 U.S. 370, 130 S.Ct. 2250, 2261 (2010). Among the factors to be considered under the totality of

1    circumstances is the existence of a signed waiver and the defendant's prior experience

2    with the criminal justice system. *United States v. Crews*, 502 F.3d 1130, 1140 (9th Cir.

3    2007).

4         Here, the prosecution established by a preponderance of the evidence that Smith

5    made a voluntary, knowing, and intelligent waiver. The prosecution presented a waiver

6    signed by Smith, (Mot. Hr'g, Ex. 1), and Smith did not contest that the signature was his,

7    (Mot. Hr'g Tr. 8:7–17). Agent Woods testified that he read the form to Smith, and Agent

8    Woods signed the form at the time as a witness. Agent Terry was in the car at the time

9    and corroborated Agent Woods's testimony.

10        In addition to the signed waiver, the totality of the circumstances also supports a

11   valid waiver. Both agents testified that Smith never indicated his desire to remain silent

12   or speak to an attorney. Smith admitted that his statements were voluntarily and he did

13   not ask for an attorney. (*Id.* at 30:20–31:25.) Smith denied that the warnings were read to

14   him, but he has been arrested on other occasions and his background and experience in

15   the criminal justice system support the conclusion that he was adequately informed of his

16   rights. (*Id.* at 51:12–18.)

17        Smith's motions asserted that any waiver was made while there were multiple

18   guns drawn and pointed at him. The testimony at the hearing established that the agents at

19   the door did not draw their weapons. The backup agents were out of sight and never

20   pointed their weapons at Smith.

21        Smith also notes that he later invoked his rights after speaking with an attorney,

22   but he does not allege that any interrogation happened after that invocation. He provides

23   no support for the argument that this later invocation should affect the validity of his

24   earlier waiver.

25        The Motion to Suppress Evidence for Failure to Afford Smith his Miranda Rights

26   is denied.

27

28

**3.      Voluntariness and Religious Intimidation**

Independent of the dictates of *Miranda*, the Due Process Clause requires that any statement made by a suspect be voluntary. *Oregon v. Elstad*, 470 U.S. 298, 304–05 (1985). "If a suspect's statements had been obtained by 'techniques and methods offensive to due process,' or under circumstances in which the suspect clearly had no opportunity to exercise 'a free and unconstrained will,' the statements would not be admitted." *Id.* at 304 (quoting *Haynes v. Washington*, 373 U.S. 503, 515 (1963)). In other words, "[a] confession is involuntary if coerced either by physical intimidation or psychological pressure." *United States v. Haswood*, 350 F.3d 1024, 1027 (9th Cir. 2003).

"In cases involving psychological coercion, 'the pivotal question ... is whether[, in light of the totality of the circumstances,] the defendant's will was overborne when the defendant confessed.'" *Ortiz v. Uribe*, 671 F.3d 863, 869 (9th Cir. 2011) (quoting *United States v. Miller*, 984 F.2d 1028, 1031 (9th Cir. 1993)), *cert. denied*, 132 S.Ct. 1811 (2012). "While a confession accompanied by physical violence is *per se* involuntary, psychological coercion provokes no *per se* rule." *Miller*, 984 at 1030 (citation omitted). Invocation of a suspect's religious beliefs during an interrogation similarly creates no *per se* rule, and should instead be analyzed as part of the totality of the circumstances. *See id.* at 1031–32.

Here, under the totality of the circumstances, Smith's will was not overborne by references to his religion or other factors. One FBI agent made references to Smith's church leader by name. The agent confronted Smith about paying tithing with the allegedly fraudulent money and asked if Smith had told his religious leaders that he was honest in his actions. These questions were undoubtedly meant to make Smith feel uncomfortable and guilty. While this line of questioning implied that Smith's standing in his church could be affected by the alleged crimes, the FBI agent only had control over the criminal charges he was investigating and did not have any authority to impose religious consequences on Smith. At the hearing, Smith was inconsistent about whether the agent mentioned excommunication from the church or whether that was merely

inferred. (Mot. Hr'g Tr. 49:2–25.) Regardless, it is not impermissibly coercive for an agent to point out the natural consequences that will follow from a criminal conviction, such as the loss of reputation or respect from a suspect's family, community, or religion. Smith strongly objects to the invocation of his religious beliefs, but it was established at the hearing that nothing of substance was said by Smith after the references to his beliefs. (*Id.* at 29:11–22.) Even if the Court had determined that the references to religion had gone too far, Smith did not identify any statements that he made subsequently that the Court would need to suppress.

The other circumstances surrounding the interrogation also do not indicate that Smith's will was overborne. While Smith contested some of the statements in the interview report, he conceded that he gave the other statements voluntarily. As discussed above, there was no overwhelming police presence or threatening with guns or other physical violence. Smith was offered water and the opportunity to use the restroom. The entire interview only lasted between one-and-a-half to two hours, half of which was in the car.

Even if the agents' conduct violated their own policies or other federal laws, Smith has not cited to any authority that would require the Court to suppress the statements because of that. Smith can pursue a remedy through a civil lawsuit if he desires, but the suppression of custodial interrogations is guided by the Constitution as interpreted in the cases discussed above.

The Motion to Suppress Evidence Because of FBI Use of Smith's Religion to Intimidate Him is denied. Therefore,

**IT IS HEREBY ORDERED** that Defendant's Motion and Memorandum in Support of Motion to Suppress Evidence Because of Illegal Search and Seizure Without Warrant and to Smith's Great Harm, (Doc. 43), is **denied.**

**IT IS FURTHER ORDERED** that Defendant's Motion and Memorandum in Support of Motion to Suppress for Failure to Afford Smith his Miranda Rights, (Doc. 45), is **denied.**

1       **IT IS FURTHER ORDERED** that Defendant's Motion and Memorandum in

2   Support of Motion to Suppress Because of FBI Use of Smith's Religion to Intimidate

3   Him, (Doc. 42), is **denied.**

4       Dated this 16th day of October, 2013.

5

6

7   _____

8                       G. Murray Snow
                    United States District Judge
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28